# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed June 24, 1901.

## MARYLAND BREWING COMPANY

VS.

## WM. L. STRAUS.

*Wm. A. Fisher, Thomas R. Clendenin, Edwin G. Baetjer* and *Frank Gosnell* for plaintiff.

*McComas, Gaither & Greenbaum* and *Cowen, Cross & Bond* for defendant.

DENNIS, J.—

The contract, which is the cause of action in this case, reads as follows:

"This agreement, made this 17th day of March, 1899, by and between the Maryland Brewing Company of Baltimore City, a body corporate, party of the first part, and Wm. L. Straus, of Baltimore city, party of the second part: Witnesseth, That in consideration of the mutual covenants herein contained, the said parties hereto do agree and obligate themselves, as follows:

First. The Maryland Brewing Company hereby employs the said William L. Straus for a period of five years beginning as of the 15th of March, 1899, as manager of the brewery known as the National Brewing Branch of the Maryland Brewing Company, and it agrees to pay him a salary of $8,000 per year, payable in equal monthly instalments.

Second. William L. Straus agrees that he will during said term devote such time and attention to the performance of such duties as pertain to the position of manager as aforesaid; that he will execute, perform and observe in letter and spirit all orders, requirements, instructions or resolutions of the Board of Directors or its fully authorized officers appertaining to his position; and that he will put forth his best efforts to promote the welfare of the said Maryland Brewing Company.

Third. In consideration of the premises and the sum of one dollar in hand paid, the said William L. Straus, *as a severable contract*, also covenants and agrees that he will not, either directly or indirectly, during a period of five years ensuing from March 15th, 1899, engage in or have any connection whatsoever with, or any interest in the sale or manufacture or disposition of beer or brewery products in the city of Baltimore, or within a radius of 50 miles, except by the request and in the interest of the party of the first part. And this stipulation shall remain in full force and effect unless the said party of the second part is *wrongfully discharged* by the party of the first part.

Fourth. The said party of the second part also agrees that in the event of the aforesaid branch, for which he is now employed as manager, being discontinued for any reason or for any time, then he will perform such other managerial services as may be required of him." Then follows the formal signatures of the parties, &c.

On March 22nd, 1901, receivers were appointed for the Maryland Brewing Company, and on March 30th, 1901, Straus, who had duly entered upon his duties under the above contract and continued to perform them until March 31st, 1901, having received his salary regularly up to and inclusive of that date, addressed a letter to Mr. Whitridge, president of the Maryland Brewing Company, informing him that "after March 31st, 1901, I, (Straus) shall consider myself no longer in the service of your company, and shall no longer serve as manager of the National Branch."

The bill filed by the plaintiff alleges that the defendant, Straus, in violation of his agreement as above set forth, is about to enter the service of the Monumental Brewing Company of Baltimore City, a competitor of the plaintiff and very near its National Branch of which the defendant was manager, and asks that the defendant be restrained from entering into such service, or violating his contract in regard thereto, until the five years provided for in the contract have expired, or until he is wrongfully discharged by the plaintiff.

The defendant, in his answer, frankly admits that he proposes to enter into the service of said competing company, and claims the right to do so, upon the ground that he is no longer bound by the contract, by reason of the appointment of receivers for the company, and he also denies, upon legal grounds, the right of the plaintiff to relief by injunction.

If the contract between these parties was one *solely* for *personal services*, or if the agreement for personal services was so interwoven into the other agreements as to make them all interdependent and inseparable, I should have no hesitation in dismissing the bill and leaving the plaintiff to its action at law to recover damages for the violation by the defendant of such contract for services. I agree with the

172

contention of the learned counsel for the defendants that the services in this particular case are not of that "unique" character which would alone justify a court of equity in interfering by injunction, besides other substantial grounds which would forbid the exercise of that remedy.

But I do not so construe this contract. It is, in its nature, and also both upon its face and in view of the circumstances under which it was made, a contract the covenants of which are distinctly severable. It is declared by the parties to it, in express terms, that it shall be so treated; and while no mere declaration of the parties could make a contract severable which was necessarily from its nature non-severable, yet, when the stipulations are not necessarily and inherently interdependent, and they can be so construed as to stand separately, then the declaration of the contracting parties that it shall be so construed, is entitled to great weight with the court, in determining the intention of the parties in entering into, and consequently the true meaning and effect of the contract.

The testimony shows that in the purchase by the plaintiff of the National Brewery Co., of which the defendant was manager, and in which he was a very large stockholder, one of the most important elements of valuation was the good will of the business. This good will did not consist in a trade mark or any special brand of its goods, but very largely, if not entirely, it rested upon and was composed of, the influence and the relationship between the manager of the brewery and its customers, and so entirely did the good will depend upon the influence and follow the person of the manager, that it is shown by the testimony that a manager could carry with him to a rival brewery from 75 to 90 per cent. of his customers. This is not only the opinion of experts in the business, but instances are given where this percentage of trade was actually effected by a transfer by a manager of his services. In the case of the National Brewing Company, this good will arises from Straus' connection with it as manager, was estimated to amount to between 33 to 50 per cent. of the total value of the brewery property, for which the plaintiff paid $650,000 cash, of which sum Straus himself received $180,000.

It was to protect this good will that the contract was entered into. It had two features—one to engage Straus' services as manager, and the other to prevent him from carrying off his trade in the event of his ceasing to be manager otherwise than by the wrongful discharge by the plaintiff. As long as he was manager he was to receive $8,000 a year; if he ceased to be manager, unless wrongfully discharged, he still was not allowed to give his services to a rival concern during the period of five years, and in the City of Baltimore, or within a radius of 50 miles. The two stipulations of the contract are wholly separate and distinct; they are related; because they both grow out of the same subject-matter, and have mainly in view the accomplishment of the same end, but they are not interdependent, and there is no difficulty in enforcing the one even if the same remedy is not available for a breach of the other.

That a contract not to engage in a rival business, entered into by a vendor in favor of the vendee of that business and its good will, provided the restriction as to territory and the limitation as to time be reasonable (and it is not disputed that in this case the stipulating of the contract are wholly reasonable in both respects) will be enforced in equity by injunction, is too well settled in this State to require discussion. Guerand vs. Dandelet, 32 Md. 561.

It rests upon the principle so well and tersely stated by Lord McMaghton in a recent English (H. of Lords case, Trego vs. Hunt) case. "It is not right to profess and to purport to sell that which you do not mean the purchaser to have; it is not an honest thing to pocket the price and then to recapture the subject of sale, to decoy it away or call it back before the purchaser has had time to attach it to himself and call it his very own."

There is, under the terms of the contract, but one thing which can release Straus from the obligation contained in this third stipulation, and that is his *wrongful discharge* by the plaintiff fom his employment as manager, as provided for in the first clause. On behalf of the defendant, it is contended that the appointment of receivers for the plaintiff operated *per se* to work such wrongful discharge; it is not alleged that he was discharged in fact

by the receivers, nor is any other fact alleged to constitute such wrongful discharge; the mere legal effect of the appointment of receivers is exclusively relied upon. I do not think that the mere appointment of receivers, nor the terms of the decree under which they were appointed, had any such legal consequences.

Granting for the sake of argument, that the appointment of receivers would give Straus the *right* to leave the service of the Maryland Brewing Company (upon the theory of a "change of masters"), yet that would not make a *wrongful discharge*, which alone would release him from his obligation. Other things might terminate his service, but a wrongful discharge alone would release the covenant. Thus, he might resign, or refuse to perform the duties of manager, or the Brewing Company might release him from its service, or employ some one in his place while still retaining him in its service and paying him the salary or illness might incapacitate him from performing the duties of his office; any of these things would give the defendant the right to leave the services of the Maryland Brewing Co.; but no one of them would constitute a *wrongful discharge*. The condition would not be broken by any thing which would give him the *right* to leave the service, but only by such things as would *compel* him to leave it, without fault on his part.

This leaves, therefore, the naked question, did the appointment of receivers *per se*, by operation of law, work a wrongful discharge within the meaning of the contract; or was there anything in the terms of the order appointing receivers, which produced that result?

I consider the law in this State to be well settled that the mere appointment of a receiver is not a breach or discharge of any contract; he has the right to affirm or disaffirm all contracts, and a reasonable time within which to make his election; if he affirms, the old contract is continued and it is not a new contract, if he disaffirms, the contract is not destroyed, but its obligation remains in favor of the other party and he has the same rights against the receivers as he would have had against the original party had the latter repudiated it.

If, therefore, the receiver has the right to affirm or disaffirm at his option, it is a complete answer to the contention that his mere appointment works a dissolution of the contract and amounts to a wrongful discharge.

The mere power to commit a breach of the contract by a discharge of an employe, would not amount to a breach until the actual discharge was accomplished, and granting that the defendant might have a right to leave the service of the company because of the appointment of receivers, his right to leave would not amount to a wrongful discharge. No case has been quoted in which the mere appointment of receivers has ever been held to have such effect, nor can I conceive how, upon any legal principle, it can be so ruled. Nor was there anything in the order appointing the receivers which worked that result. Counsel for the defense point to that portion of the order which enjoins any one from interfering with the receivers in the management or control of the property, and base upon it the claim that for Straus to have continued his duties as manager of the National Branch would have been a violation of the injunction and subjected him to punishment for contempt of court; but in this connection they give no heed to the express provision of the order that the business shall be continued in the same manner and conducted as theretofore. The fundamental idea of the order was that the business should be kept as "a going concern"; it is apparent upon its face, in every provision; and a construction would be absurd, which would, by giving a forced construction to a subordinate clause, manifestly intended only to prevent interference with the management and control by the receivers, by outsiders or others, who should refuse to recognize their authority, have the effect of defeating the *whole purpose of the order*, by clogging every wheel in the machine and putting a dead stop to its operations, until a new contract should be made by the receivers with every employee, from roustabout up. Construing the whole order together, there is not the slightest difficulty about it; nor any justification for the contention that it operated as a discharge of *any* employee, or wrought any change in their relations to the company. It left the receivers to take hold as they found

the property—to continue its management, with the right to them to discharge, at their option, any employee, but was not meant to work, and cannot be construed as having worked, the instantaneous discharge of every one connected with the concern. That Straus himself did not believe it had the effect from which he now seeks to attribute to it, is clear; else why did he still consider himself in the employ of the company, and accordingly perform his duties as manager, after the receivers were appointed and without being re-engaged by them, up to March 31st, 1901; and why did he consider it necessary then to inform the receivers by his letter that from that date he should consider himself no longer in the service of the company.

From no point of view can I find that the defendant has been released from the stipulation in his contract, by any wrongful discharge from the employment of the plaintiff, and I will, therefore, make the injunction perpetual.